IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

STEPHON MASON            *
                         *    Civil Case No. AW-08-2260
v.                       *    Criminal Case No. AW-03-0321
                         *
                         *
UNITED STATES OF AMERICA ******

## MEMORANDUM OPINION

### I

Before the Court is a Motion/Petition by the Petitioner/Defendant, Stephon Mason, for relief pursuant to 18 U.S.C. § 2255. The Government has filed an opposition to the Motion and the Petitioner has filed his reply to the Government's opposition. The Motion is now ripe for resolution.

### II

Some brief background information is in order. Petitioner (Stephon Mason), Deone Anthonio Melvin, Ramone Jones, and Adrian Alexander along with 11 others were charged in a 15- count federal indictment in Maryland handed down on July 9, 2003. Although the charges varied with respect to each defendant, the essential charges ranged from conspiracy to distribute and possess with the intent to distribute cocaine and cocaine base, money laundering, possession of a firearm by a convicted felon and possession of firearm in furtherance of a drug trafficking crime. On November 13, 2003, Petitioner, Jones, Melvin, and Alexander were charged along with 12 others in a 15-count superseding indictment again alleging drug trafficking, money laundering and/or possession of firearms. Petitioner, Jones, Melvin, and Alexander went to trial. A number of co-conspirators

testified during the trial. The record is quite voluminous but the Court will briefly summarize the operative facts.

Commencing in 1997, Shahid Omar ran a drug distribution operation in Maryland. Omar obtained his cocaine in New York from Franscisco Despiau who had several different sources of supply. Omar made regular trips to New York, often accompanied by Petitioner, and traveled in vehicles containing hidden compartments used for storing drugs. Once the cocaine arrived in Maryland, Omar sold it to customers, including Petitioner who was also a customer. Petitioner in return had customers, including a customer somewhere in 1999 by the name of Arron Harrod. On September 4, 1999, Harrod met Omar and Petitioner to consummate a three kilogram transaction. After Harrod approached the vehicle and handed Petitioner $66,000, Omar shot Harrod about 8 or 9 times. Harrod survived and was later bribed for $25,000 by Petitioner not to testify against Omar. Although Harrod signed an affidavit that Omar did not shoot him, nevertheless at Omar's trial, Harrod testified truthfully. While Omar was incarcerated, Petitioner took the helm and began a relationship with Despiau where he traveled on several occasions to New York to make numerous drug purchases, paying Omar a fee for having given Petitioner the (Despiau) source. In April of 2000, Petitioner was stopped and his blue Ford Windstar was searched wherein weapons were seized, including, the gun which Omar had used to shoot Harrod. Petitioner was arrested and incarcerated. Melvin and Jones then took the leadership of the organization and traveled to New York to purchase drugs and numerous vehicles with hidden compartments from Despiau. Melvin and Jones [occasionally accompanied by others who rode with them] made purchases of approximately 10 kilograms of cocaine each week. Most of the vehicles equipped with hidden compartments were placed in the names of others different from the true users and drivers. Melvin and Jones were also

assisted from time to time by drivers who picked up and delivered drug money to Despiau. Melvin employed Alexander as driver and Jones used Bennie Wilder.

While incarcerated, Petitioner sent letters insisting that Melvin and Jones pay him a fee each time they obtained cocaine from Despiau. In summer of 2002, Petitioner was released from incarceration and Petitioner, Melvin and Jones continued to purchase cocaine from Despiau. Between summer of 2002 and spring of 2003, Petitioner, Melvin and Jones distributed at least 80 kilograms of cocaine. Petitioner distributed both cocaine and crack which he prepared in a microwave. By the spring and summer of 2003, Petitioner and Jones had incurred significant debt on the cocaine purchases. As a result Despiau cut off the supply which frustrated Petitioner, Melvin, Jones and Alexander. During the summer of 2003 the investigation continued with Title III interceptions over targeted and related telephones. Law enforcement officials overheard numerous conversations regarding drug purchases, distributions, the problems with the indebtedness to Despiau, and the search for potential new sources. The wiretaps also enabled law enforcement officials to learn about the titling of vehicles in names of others, about which vehicles had hidden compartments, about ways to hide the cocaine brought back from New York, and about where and in which residences they should store and hide weapons.

The investigation concluded on July 31, 2003 with the execution of multiple search warrants. The Court need not particularize those items seized and attributed to others, but with reference to Petitioner, law enforcement agents recovered at Petitioner's home in Fort Washington, Maryland a RG .38 caliber revolver with an obliterated serial number. In addition, agents found in a hidden

compartment within a blue Ford Explorer [which was parked at the home in Fort Washington, Maryland] approximately 125 grams of cocaine and a Heckler & Koch .45 caliber pistol. The blue Ford Explorer had been identified as one of several vehicles utilized during the course of the alleged conspiracy.

In July 2004, a jury convicted Petitioner of possession of a firearm by a convicted felon but deadlocking on all remaining counts relating to Petitioner. Following a retrial in June of 2005 Petitioner was convicted by a second jury of conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base (crack), conspiracy to commit money laundering, money laundering, and possession of a firearm in furtherance of a drug-trafficking crime.

On September 26, 2005, the Court sentenced Petitioner to life plus five years imprisonment to be followed by 10 years of supervised release. Petitioner appealed his verdict and judgment to the United States Court of Appeals for the Fourth Circuit where his sentenced was affirmed on July 13, 2007. (*See*, 2007 WL 2046735 (C.A.4 (Md).) This present Motion/Petition to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 was timely filed on August 29, 2008 and the Motion is now ripe for resolution.

### III

Petitioner presents essentially four grounds which he contends entitle him to relief. The Government on page 7 of its opposition and response to the Motion appears to have accurately articulated those four grounds. The Court will lift those grounds as stated by the Government as well as other issues alleged by Petitioner in his hand written form. **First**, Petitioner claims Governmental misconduct in that the Government withheld evidence regarding the testimony of

4

Francisco Despiau ( the chief cooperating witness) in violation of Petitioner's Due Process Rights under *Brady v. Maryland* 373 U.S. 83 (1963). In this connection, Petitioner asserts that the Government permitted Despiau to testify falsely and the Government did not provide Petitioner with exculpatory evidence the Government had in its possession. **Second**, Petitioner posits that his trial counsel provided ineffective assistance of counsel in failing to properly investigate, in failing to object during cross examination, and in failing to file a motion for a new trial based upon the *Brady* violation. **Third**, Petitioner claims to be a victim of ineffective assistance of counsel by his appellant counsel who failed to properly investigate, failed to file a direct appeal brief or to amend his appellate brief to include a *Brady* violation and to include a failure of trial counsel to have raised a *Brady* violation, failed to file a Petition for *Certiorari*, and failed to file a Motion to compel the trial attorney to file an Andes brief. **Lastly**, Petitioner claims that his trial counsel was laboring under a conflict of interest because he failed to file a motion to sever Petitioner from the other defendants in order for another defendant (Melvin) to testify on behalf of Petitioner. The Court will discuss these four claims in turn.

### IV.

Petitioner first alleges a **Brady** violation, specifically alleging that the Government was aware that Omar was on house arrest during the time that Despiau testified to a meeting in New York between Petitioner, Despiau and Omar. Petitioner claims that Despiau's testimony was untruthful, the Government knew the testimony was false and the Government never provided this alleged exculpatory evidence to the defense. Under *Brady*, the burden rests upon a defendant to show that certain undisclosed evidence was (a) favorable to the defendant, (b) material, and (3) that the

5

prosecution had the materials and failed to disclose them. The *Brady* rule, however, does not compel the disclosure of evidence which is available to the defense from other sources, including diligent investigation by the defense. *Stockton v. Murray* 41 F.3d 920, 927 (4th Cir.1994). Moreover, evidence which is not merely available to the defendant but which is actually known by the defendant falls outside of the *Brady* rule. See, *Fullwood v. Lee*, 209 F.3d 663, 685-86 (4th Cir.2002) and *West v. Johnson* 92 F.3d 1385,1399 (5th Cir.1996). In other words, evidence which the defendant either knew or should have know using reasonable diligence does not fall within the strictures of the *Brady* rule.

The Court agrees with the Government's response that Petitioner had personal knowledge and was well aware of Omar's house arrest status. Petitioner was present at the initial trial and heard the testimony of Despiau with respect to the alleged meeting in New York. The record also reflects that Petitioner was present when Omar shot Harrod. The record further reflects that Petitioner participated in the attempted bribery of Harrod to persuade Harrod who survived not to testify against Omar. Moreover, Petitioner took over leadership of the organization when Omar was incarcerated paying Omar a fee for each drug deal Petitioner did with Despiau during Omar's incarceration. It is clear that Petitioner was intimately knowledgeable of Omar's arrest and probable release status. There is no Brady violation for the Government to not disclose evidence of which the Defendant/Petitioner has actual knowledge. See *Fullwood v. Lee* 290 F.3d 663, 685-86 (4th Cir.2002).

In addition to Petitioner's actual knowledge that Omar was on house arrest, the Court also believes that the alleged withheld evidence as to whether Omar was present at a meeting in New York

6

with Petitioner lacked materiality when viewing at best what appears to be a minimal impact in comparison to the mound of evidence linking Petitioner to the drug conspiracy and related charges. For evidence to be material, there must be a reasonable probability that the disclosure of such evidence would have produced a different result. See, *United States v. Stokes*. 261 F.3d 496,502 (4th Cir. 2001). As previously indicated, there was evidence of Petitioner assuming the leadership role when Omar was incarcerated. The jury also considered evidence of Petitioner's request (via a letter) to co-defendants Melvin and Jones that Petitioner be paid during the time Petitioner was incarcerated. Moreover, there was evidence that upon his release from incarceration, Petitioner resumed his role in seeking to purchase and distribute drugs. When you consider the numerous surveillance done by law enforcement agents, what was learned through the Title III interceptions, the testimony linking Petitioner to automobiles with secret compartments for storing drugs, the testimony of several witnesses, including additional cooperators connecting Petitioner to the organization, and the evidence seized at the conclusion of the investigation, it is clear that the jury had ample evidence to connect Petitioner as a key and integral part of the conspiracy.

Finally, all of the attorneys in the case (including Petitioner's counsel) argued to the jury that Despiau, the key witness who was on the stand for a couple or more days, was not a credible witness. On cross examination, the attorneys hammered and peppered Despiau with tough questions concerning contradictions in his testimony. These attorneys brought to the attention of the jury nearly every conceivable benefit Despiau was receiving for testifying. The Court believes that the jury had a sufficient basis and opportunity to assess all of the evidence, including any inconsistencies in the testimony. The jury also considered the arguments by all of the counsel who made every effort

in their summations to discredit the testimony of Despiau.  In sum, Petitioner's claim that because Omar was on house arrest and not at a particular meeting in New York cannot be considered material evidence in the face of what the Court believes was overwhelming evidence connecting Petitioner to the drug and money laundering conspiracies, and the gun offenses.  Because Petitioner knew or should have know that Omar was on house arrest and because the Court does not find that the evidence of Omar's house arrest to be material evidence, the Court determines that there was no *Brady* violation.

With respect to Petitioner's twin claims (grounds two and three) that his trial counsel and appellate counsel were constitutionally ineffective, the Court reviews his allegations under the well established standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), under which a claimant must establish the two prong standard of deficient performance and prejudice.  In other words, in order to succeed on his claim of ineffective assistance of counsel, Petitioner must show that his counsel's performance was deficient in that counsel made errors so serious that he ceased to function as a counsel within the meaning of the Sixth Amendment, and that the alleged deficient performance prejudiced the defense.  Id.

Both of these claims can be disposed of rather quickly. Preliminarily, Petitioner makes general allegations against both trial and appellate counsel with respect to the failure to properly investigate. Without something specific, the Court considers these but bald allegations and bereft of merit. Moreover, Petitioner's complaints set forth in his handwritten Motion with reference to his trial counsel's failure to request a new trial, and the failures of his appellant counsel to file a direct appeal brief, to file for Certiorari, and to file a motion to have the trial lawyer to file an Andes brief are

likewise vague, without specificity and, as such, do not set forth a basis for relief under § 2255. Petitioner's essential complaint against trial and appellate counsel is that neither one raise, articulated and pressed the *Brady* issue. Inasmuch as the Court has addressed the Brady issue and has concluded that there was no *Brady* violation in this case, it must follow that Petitioner has failed to make any showing on this record that counsel's performance was legally deficient. Nor is there any evidence of prejudice pursuant to the Strickland standard. Accordingly, Petitioner's ineffective assistance of counsel claims must fail.

Petitioner's final claim appears to be that his counsel had a conflict of interest. Petitioner contends that Melvin, one of Petitioner's co-defendants, wanted to testify (presumably favorably) for Petitioner, however, Melvin's attorney [apparently] advised Melvin of the perils should Melvin testify. Petitioner posits that his counsel should have requested a severance in order that Melvin could have testified for Petitioner. What the Court gathers from the record is that subsequent to his sentencing (more than a year later) Petitioner provided his counsel with a one paragraph affidavit supposedly signed by Melvin and proceeded to advise his trial counsel in a letter dated October 11, 2006 that counsel had a conflict of interest because co-defendant (Melvin) had been willing to testify for Petitioner.

Preliminarily, the Courts notes that contrary to any inference by Petitioner that a motion to sever was not filed, a review of the docket reflects that a motion to sever was actually filed on behalf of Petitioner in the first trial. (See paper #191--filed on February 6. 2004). On appeal following a re-trial, all of the defendants raised severance issues contending that the Court erred in denying their motions to sever. In its unpublished opinion, the Fourth Circuit considered all of the evidence and

9

circumstances surrounding the trial-- affirming the District Court and finding nothing prejudicial nor erroneous with respect to the Court's deference to the general preferential approach for joint trials of defendants who are indicted together. *See 2007 WL 2046735 (C.A.4 (Md.)*

Months after both Petitioner and Melvin were sentenced, Petitioner's counsel was advised that co-defendant Melvin wanted to testify for Petitioner but was advised by his (Melvin's) counsel not to take the stand and testify. The verbatim content of the hand written statement by co-defendant Melvin is as follows: "I, Deone Melvin, wanted to testify for Stephen Mason in my drug conspiracy trial in May 2005 but my lawyer advised me not to and I didn't know that I could have went against his judgment. Stephon Mason gave me and my mother Audrey Melvin money solely for paying bills. There was no criminal activity nor criminal intent involved."

Petitioner now appears to suggest that his counsel had a conflict and should have moved for a severance or reconsideration of the previous denial of the motion for a severance. Both parties cite *United States v. Parodi* 703 F.2d 768 (4th Cir.1983), where the Fourth Circuit set forth the requirements for severance requested on account of the need for the testimony of a co-defendant: 1) a bona fide need for the testimony of his c-defendant; 2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege; 3) the substance of his co-defendant's testimony; and 4) the exculpatory nature and effect of such testimony. Parodi at 779. Considering the circumstances of the case at bar, it is clear that there was no conflict of interest nor was there a violation of the spirit of *Parodi*. Counsel for co-defendant Melvin wisely and professionally advised Melvin not to state the stand and had the Court granted the Motion to Sever, it is doubtful and speculative at best that Melvin would have gone against the advise of his

experienced and prudent counsel. Moreover, the effect of the proffered testimony appears to this Court to have been minimal when considering the enormity of the evidence before the jury pointing to the involvement of both Petitioner and Melvin in the conspiracies and related offenses. For these reasons, the Court cannot find that the counsel for Petitioner had a conflict nor can the Court on this record conclude that Petitioner's counsel performance was improper or constitutionally ineffective..

<u>V</u>

In sum, the Court has reviewed the current pleadings and the entire files relative to the present Motion as well as the underlying criminal case. The Court finds that Petitioner has not demonstrated a legal and cognizable basis for relief. Accordingly, the Petitioner's motion pursuant to § 2255 is DENIED. A separate Order will be issued.

Date: April 30, 2009

Alexander Williams, Jr.
United States District Judge