```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
```

UNITED STATES OF AMERICA           :

    v.                             :   Criminal No. DKC 03-0321-4

STEPHON MASON                      :

**MEMORANDUM OPINION**

Stephon Mason is serving a life sentence imposed in 2005 for conspiracy to distribute over 5 kilograms of cocaine and 50 grams of cocaine base, money laundering conspiracy (240 months concurrent), money laundering (240 months concurrent), possession with intent to distribute cocaine (360 months concurrent), possessing a firearm in furtherance of a drug trafficking crime (60 months consecutive), and possession of a firearm after being convicted of a felony (120 months concurrent).  Judge Alexander Williams found that Mr. Mason was responsible for at least 150 kilograms of cocaine and more than 50 grams of cocaine base for guideline purposes, and applied a two level upward adjustment because he was convicted under 18 U.S.C. § 1956.  He was determined to be a career offender, resulting in Criminal History VI.  For the grouped counts, the resulting guideline range was 360 months to life, with a consecutive 60-month sentence for count eleven.  The life sentence was mandatory because the Government filed two

notices under 21 U.S.C. § 851 of prior convictions.  (ECF Nos. 253 and 287).

He has filed a motion for a reduced sentence.  (ECF No. 859). Mr. Mason seeks to reduce his sentence to a total of 300 months, which would result in a release date in 2025.  He argues that this relief is warranted both for compassionate relief reasons and pursuant to Section 404 of the First Step Act.  The Government opposes any relief.

### Motion for Compassionate Release

Ordinarily, "[t]he court may not modify a term of imprisonment once it has been imposed[.]" 18 U.S.C. § 3582(c) (2018).  This general rule is subject to certain exceptions, including the compassionate release provision, which allows the BOP to seek a modification of a prisoner's sentence.  *See id*. § 3582(c)(1)(A). Under the First Step Act of 2018, the compassionate release provision was modified to allow prisoners to seek a sentencing reduction directly from the court.  The provision now provides, in relevant part, that:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons

2

to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

   (i) extraordinary and compelling reasons warrant such a reduction; or

   (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

   and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

The United States Court of Appeals for the Fourth Circuit ruled, in *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), that a district court is empowered, under 18 U.S.C. § 3582(c)(1)(A), to consider any extraordinary and compelling reason that a defendant might raise, and specifically that district courts did not err in considering that mandatory consecutive stacked sentences for violations of 18 U.S.C. § 924(c), that would not be imposed under current law, resulted in sentences that exceeded those necessary to achieve the ends of justice.

**Section 404 of the First Step**

As an alternative argument, Mr. Mason asserts that he is eligible for relief under Section 404 of the First Step Act because he was convicted in count one of a covered offense.  Once relief is available, he then argues that the court can apply the changes to § 851 in the act which lowers the mandatory minimum to which he is subject.  He also contends that the sentencing package doctrine permits reduction on all concurrent sentences.

The Fair Sentencing Act of 2010 was signed into law on August 3, 2010.  It did not apply to those sentenced before its effective date.  The First Step Act was adopted in 2018, and provides that, notwithstanding *Dorsey v. United States,* 567 U.S. 260 (2102), certain persons may seek a retroactively reduced sentence.  Section 404(b) provides: "A court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed."  Section 404(a) defines a "covered offense" as a violation of a federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act that was committed before August 3, 2010.

Section 2 of the Fair Sentencing Act altered the quantity threshold for the mandatory minimums in 21 U.S.C. § 841, and Section 3 eliminated the mandatory minimum for simple possession.

4

In *United States v. Wirsing*, 943 F.3d 175, 185-86 (4th Cir. 2019), the United States Court of Appeals for the Fourth Circuit concluded that a person is eligible if he was sentenced under 21 U.S.C. § 841(a) and (b)(1)(A)(iii) or (B)(iii).  In *United States v. Gravatt*, 953 F.3d 258, 262-64 (4th Cir. 2020), the Fourth Circuit held that a defendant remains eligible under the Act even if the conspiracy for which he was convicted encompassed distribution of both cocaine powder and crack cocaine.

In *Concepcion v. United States*, 142 S.Ct. 2389, 2396 (2022), the Court held that a trial court, in adjudicating a motion under the First Step Act, may consider changes of law or changes of fact. It is not compelled, however, to exercise its discretion to reduce any sentence based on such arguments.

**Factual Background of the Offenses**

The facts as recounted in the Fourth Circuit opinion are as follows:

> Some time in 1997, Shahid Omar, who was running a drug distribution operation in Maryland, began to obtain cocaine in New York from Francisco Despiau. Despiau was a drug trafficker, with several sources of supply. He also outfitted vehicles with hidden compartments to help facilitate the transportation of drugs. Over time, Despiau sold several vehicles outfitted with hidden compartments to both Omar and Mason.
>
> Despiau's first transaction with Omar involved two kilograms of cocaine. Thereafter, Omar made trips to New York every five to six days, purchasing on average between three and five kilograms of cocaine. On some of these trips, Omar was accompanied by **Mason**.

On one occasion, **Mason**, accompanied by Jones, went to New York to retrieve from Despiau approximately $35,000, which was previously left as a deposit for cocaine that ultimately could not be obtained at that time. **Mason** and Jones were unsuccessful on this trip, but **Mason** returned to New York a few days later and retrieved the money.

Once the cocaine arrived in Maryland, Omar sold it to several customers, including **Mason**. **Mason** in turn had customers of his own, including Aaron Harrod. Harrod met **Mason** in 1999 and began purchasing cocaine from him. During one of these transactions, **Mason** brought Omar along with him. At the meeting, Harrod and Omar recognized each other, as they attended high school together. Based on this earlier acquaintance with Omar, Harrod began purchasing cocaine directly from Omar to avoid paying the middleman's premium charged by **Mason**.

On September 4, 1999, Harrod met Omar to consummate a three kilogram transaction. Harrod approached Omar's vehicle and handed **Mason**, who was a passenger in the vehicle, $66,000. Moments later, Omar shot Harrod seven to eight times, wounding him. Omar was arrested and detained for the shooting. Thereafter, **Mason** attempted to get $25,000 from Despiau to give to Harrod in exchange for Harrod's promise not to testify against Omar. When Despiau asked **Mason** what he would do if Harrod testified, Mason responded that he would "do" Harrod to prevent him from testifying. Harrod eventually received $25,000 and signed an affidavit stating that Omar did not shoot him. At Omar's trial, however, Harrod testified truthfully.

While Omar was incarcerated, **Mason** forged a direct relationship with Despiau. For his first transaction with Despiau, **Mason** traveled to New York with Jones and purchased 400 grams of cocaine. Thereafter, **Mason** purchased larger quantities of cocaine. For each of these transactions, **Mason** paid Omar a fee because Omar was responsible for finding Despiau as a source of cocaine.

In April 2000, law enforcement officers searched **Mason's** blue Ford Windstar. In the hidden compartment under the rear seat, the officers found a cache of

6

weapons, including the gun that Omar had used to shoot Harrod. Following this search, **Mason** was arrested and incarcerated. As a result, **Mason** gave Melvin and Jones permission to contact Despiau, so that they could obtain cocaine from Despiau while **Mason** was incarcerated.

While **Mason** was incarcerated, Melvin and Jones traveled regularly, by themselves and with others, to buy cocaine from Despiau. On average, Melvin and/or Jones picked up approximately ten kilograms of cocaine per week. On one occasion, they purchased approximately thirty kilograms of cocaine. Melvin and Jones also obtained from Despiau numerous vehicles containing hidden compartments. Most if not all of the vehicles were placed in names other than those of the true users.

Melvin and Jones were assisted by drivers who picked up cocaine from, and delivered drug money to, Despiau. Melvin used Alexander as a driver, while Jones used Bennie Wilder.

In letters that **Mason** wrote to Melvin and Jones from jail, **Mason** insisted that Melvin and Jones pay him a fee every time they obtained cocaine from Despiau. In the late summer of 2002, **Mason** was released from jail and immediately began to purchase cocaine from Despiau. Between the summer of 2002 and the spring of 2003, Melvin, **Mason**, and Jones together distributed at least eighty kilograms of cocaine.

**Mason** distributed some cocaine and cocaine base (crack) that he prepared in a microwave to Brian Elzey. Wilder also purchased cocaine from **Mason** in order to "cook" it into crack for resale.

By the spring and summer of 2003, Jones and **Mason** ran up such huge debts—Jones owing as much as $100,000, while **Mason** owed approximately $40,000—that Despiau cut off their supply of cocaine and sought to collect the money owed to him from prior deals. Melvin, Jones, **Mason**, and Alexander became increasingly frustrated by their inability to get more cocaine from Despiau and looked for alternate sources of supply.

During the summer of 2003, the Drug Enforcement Administration (DEA) intercepted conversations occurring over telephones utilized by **Mason** and

Melvin, including numerous conversations concerning the sale and purchase of cocaine. Melvin and Alexander were overheard discussing which vehicles with hidden compartments should be taken to New York for the purpose of bringing back cocaine and strategies for avoiding police detection during these trips. Melvin, Jones, **Mason**, Alexander, and others discussed how they could pay off the debts owed to Despiau and how soon thereafter they would be able to get more cocaine. Melvin and Jones discussed an incident in which Alexander had fled from police after being stopped because he had a gun in the glove compartment. Alexander, in another intercepted call, described an incident in which he was shot at and had to go to his vehicle to retrieve a gun and return fire. Other intercepted conversations concerned weapons and the titling of vehicles and assets in the names of other persons, including Audrey Melvin (Deone Melvin's mother) and Derrick Tobias.

At the culmination of the investigation, on July 31, 2003, Melvin, Jones, and **Mason** were arrested, along with other codefendants. Law enforcement officers also executed search warrants at multiple locations. The officers found a Glock .45 caliber pistol in Melvin's bedroom at the apartment he shared with Jones in Upper Marlboro, Maryland. During wiretapped calls, Melvin and Jones discussed placing guns at the home of Dana Dark at 4310 Lavender Lane in Bowie, Maryland, because of their concerns that law enforcement might search their apartment. At the Lavender Lane location, the officers recovered a Ruger 9 mm pistol, a Heckler & Koch .40 caliber pistol, an Intratec 9 mm pistol, and a Masterpiece Arms .45 caliber pistol.

In an area of Audrey Melvin's home utilized by Deone Melvin, agents found a rifle, a digital scale with cocaine residue, a Pyrex dish with crack residue, and other materials used for the packaging and cooking of cocaine, as well as a money counter. Upon his arrest, Melvin voluntarily waived his Miranda rights and agreed to be interviewed by law enforcement officers.

At **Mason's** home at 415 Aragona Drive in Fort Washington, Maryland, law enforcement officers recovered a .38 caliber revolver with an obliterated

serial number. In the hidden compartment of the blue Ford Explorer parked at the home, the officers found approximately 125 grams of cocaine and a Heckler & Koch .45 caliber pistol.

In December 2003, law enforcement officers located Alexander at his girlfriend's home. In a Chevrolet Tahoe registered to Alexander's brother, but used by Alexander, the officers found a Heckler & Koch .40 caliber handgun.

*United States v. Melvin*, No. 05-4997, 2007 WL 2046735, at *1–3 (4th Cir. July 13, 2007).

**The Parties' Positions**

Mr. Mason argues that he establishes "extraordinary and compelling reasons" for sentencing relief based on a combination of factors, including: the passage of the First Step Act, which changed the requirements for § 851 enhancements, rendering him ineligible for a mandatory life sentence today; the unjustified disparity between Mr. Mason's sentence and the sentences of his co-conspirators, none of whom received a life sentence, and nearly all of whom have long since been released from prison; Mr. Mason's relative youth at the time of his offense; the significant period of incarceration he has already served; and his productive use of time in the BOP.

He asserts that, today, he would not face the mandatory life sentence imposed in 2005. Instead, he would face "only" a 20-year mandatory minimum, consisting of a 15-year minimum for the drug conspiracy (although he acknowledges that two prior qualifying convictions results in a 25 year minimum) and a five year

consecutive sentence for the § 924(c) count.  He also asserts that the career offender enhancement has declined and his guidelines range would be lower. (He acknowledges that he would still qualify as a career offender but contends that variances are more prevalent.  His non-career offender guidelines would be lower, at 324 to 405 months, followed by 60 months consecutive, based on reduced quantity levels and a criminal history category of IV rather than VI.)

Mr. Mason puts great emphasis on sentencing disparity, arguing that his mandatory life sentence "created huge and unwarranted disparity" with his co-defendants.  He reports that Omar was not even prosecuted in federal court for the drug conspiracy, and that none of those who were charged federally were sentenced to life.  Instead, most received sentences between 41 and 360 months, and only two others remain incarcerated.  Both of them are also seeking sentencing reduction relief.

He continues that he was a relatively young man at the time of his offense, has spent nearly two decades in federal custody (Mr. Mason has been in federal custody since July 31, 2003, and has now served more than 19 years in prison), has had time to reflect, and has changed.  He has participated in educational, vocational, and rehabilitative programming, earned positive work performance evaluations, maintained a good attitude, and "been infraction free for two years and for long stretches of time."

Alternatively, Mr. Mason seeks relief pursuant to Section 404 of the First Step Act because count one is a covered offense and this court should apply current § 851 law in imposing a new sentence.

The Government opposes any relief, arguing that *McCoy* is wrong on the availability of compassionate release and, in any event, should be limited to stacked § 942(c) sentences and distinguished from his circumstances.  He was 31 when sentenced, had a substantial history of drug offenses, and has not exhibited "exemplary" post-conviction conduct.

The Government resists comparison with co-defendants by arguing that any differences in role or background make comparison inappropriate.  (This is a misleading description of Defendant's argument and would read sentencing disparity out of the equation altogether.)

With regard to Section 404, the Government grudgingly agrees that Mr. Mason is eligible but still argues that relief should be denied.  It points to the amount of powder cocaine involved, that changes to § 851 law are not retroactive, and that he is not entitled to a complete resentencing.

Analyzing the § 3553(a) factors, the Government again argues against any reduction.  As a key member of a large-scale drug trafficking organization, he was willing to help in preventing a cooperator from testifying against a co-conspirator, he and the

11

others kept weapons, he was and still is a career offender, has performed poorly in prison, and that any consideration of the COVID situation is inappropriate in fashioning an appropriate sentence.

## Discussion

Mr. Mason is eligible for consideration under Section 404 of the First Step Act because count one is a "covered offense." Moreover, the then mandatory life sentence is also a basis for compassionate release. After considering the appropriate factors, the court will grant a sentence reduction to Mr. Mason. Imposition of a life sentence is extreme, even considering his criminal history. None of his co-conspirators received that long a sentence, and even some of those who received significant terms have had those terms reduced, either by executive clemency or compassionate release. The fact that each defendant has a unique combination of factors to consider does not eliminate the need to consider disparity. His role, while significant, does not merit the extreme disparity between his life sentence and the 20 to 30 year range others have served or are serving. (Motions of two other defendants are being considered at this time, but reductions are being denied. Each currently is serving a 360-month sentence, was found responsible for the same quantity of cocaine, and played a leadership role in the offense. Their criminal histories were less serious than Mr. Mason's.) Mr. Mason was present when Omar shot Harrod and then participated in trying to silence him. His

12

conduct thus was more serious than the others, even if Judge Williams considered Mr. Melvin to be more of a manager in the drug conspiracy. His criminal history is not as benign as counsel argues, placing him in category VI even without career offender status.

While his prison conduct is not perfect, there are signs that he is maturing and gaining insight, meaning that prison has been serving its deterrent and rehabilitative purposes. His relationships with family and friends also bodes well for good conduct when eventually released.

Overall, considering the appropriate factors, the sentence will be reduced to 384 months, consisting of 324 months concurrent on counts one and ten, followed by 60 months consecutive on count eleven.

A separate order will follow.

/s/<br>
DEBORAH K. CHASANOW<br>
United States District Judge